Marcus A. Nussbaum, Esq. (MN 9581)
Ilya Fishkin, Esq. (IF 4948)
169 Commack Road, Ste. H371
Commack, New York 11725
Tel: 201-956-7071
Fax: 347-572-0439
marcus.nussbaum@gmail.com
***Attorneys for Plaintiff***

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AARON HARDING,<br><br>                          Plaintiffs,<br><br><br>              -against-<br><br><br>DORILTON CAPITAL ADVISORS LLC,<br>DORILTON CAPITAL MANAGEMENT<br>LLC, ALCORITY LLC, ONETHIRTYONE<br>LLC, SAMUEL MATHEWS and John Doe,<br>*the unnamed owner of the Dorilton Corporate*<br>*Entities Whose Identity Has Been Withheld*,<br>Jointly and Severally,<br><br><br>                      Defendants. | **<u>COMPLAINT</u>**<br><br>**Jury Trial Demanded** |

Plaintiff AARON HARDING ("Plaintiff"), upon personal knowledge as to himself and upon information and belief as to other matters, alleges as follows:

## NATURE OF THE ACTION

1.      Plaintiff is a former employee of defendants DORILTON CAPITAL ADVISORS LLC, DORILTON CAPITAL MANAGEMENT LLC, ALCORITY LLC, ONETHIRTYONE LLC, where he was employed as a member of defendants' information technology (IT) department. Between September of 2019 and August of 2021, Plaintiff was harassed, discriminated against and received an unwarranted amount of unfair treatment by his direct supervisor, Samuel Mathews, on the basis of Plaintiff's race and color (Plaintiff is black and of Jamaican origin). As a result of Plaintiff reporting this pattern of unfair treatment, harassment, discrimination through the appropriate channels to human resources, Plaintiff was retaliated against for such act and his employment was promptly terminated.

2.      There is no single event, but rather a prolonged pattern of unfair treatment, harassment, discrimination and retaliation.  Mathews' treatment of Plaintiff was noticeably different from that of his similarly situated colleagues. The Human Resources (HR) of defendants and their leadership ignored Plaintiff's reports of the discriminatory behavior.

3.      Accordingly, this is a discrimination and retaliation action by Plaintiff against his former employers and supervisor Samuel Mathews who subjected Plaintiff to discrimination and retaliation based upon race and color. Plaintiff claims damages under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., as amended by the Civil Rights Act of 1991, and New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code§§ 8-107(1)(a) and (16) and invokes the Court's supplemental jurisdiction for the NYCHRL claims. Plaintiff also seeks punitive damages, expenses and attorneys' fees.

## JURISDICTION AND VENUE

4.     This action arises under Title VII of the Civil Rights of 1964, 42 U.S.C. §§ 2000e, *et seq*.  Jurisdiction is founded on 42 U.S.C. §§ 2000e-5(f)(3), 28 U.S.C. §§ 1331, 1337 and 1343(3) and (4). The Court has supplemental jurisdiction over the New York City Human Rights Law claims.

5.     Venue is proper in this district pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this district and Defendants' businesses are located in this district.

## THE PARTIES

**Plaintiff:**

6.     Plaintiff Aaron Harding ("Plaintiff") was, at all relevant times, employed by defendants on a full-time basis in defendants' information technology (IT) department where his responsibilities were enterprise resource planning software ("ERP") development and support. Plaintiff is a member of three classes protected by Title VII of the Civil Rights Act of 1964, in that he is black, of Jamaican origin, and he protested acts made illegal by Title VII.

**Defendants:**

7.     Upon information and belief, defendant DORILTON CAPITAL ADVISORS LLC ("DCA") is a foreign limited liability company formed under the laws of the state of Connecticut and authorized to do business in the state of New York with its principal place of business at 32 Avenue of the Americas, 26th Floor New York, NY 10013.

8.     Upon information and belief, defendant DORILTON CAPITAL MANAGEMENT LLC ("DCM") is a foreign limited liability company formed under the laws of the state of Delaware and authorized to do business in the state of New York with its principal place of business at 32 Avenue of the Americas, 26th Floor New York, NY 10013.

9.     Upon information and belief, defendant ALCORITY LLC ("ALCORITY") is a foreign limited liability company formed under the laws of the state of Delaware and authorized to do business in the state of New York with its principal place of business at 32 Avenue of the Americas, 17th Floor New York, NY 10013.

10.    Upon information and belief, defendant ONETHIRTYONE LLC ("ONETHIRTYONE") is a foreign limited liability company formed under the laws of the state of Delaware and authorized to do business in the state of New York with its principal place of business at 32 Avenue of the Americas, 26th Floor New York, NY 10013.

11.    DCA, DCM, ALCORITY, and ONETHIRTYONE are hereinafter referred to collectively as the "Dorilton Group Enterprise" or the "Corporate Defendants."

12.    Upon information and belief, John Doe is the secretive owner of DCA, DCM, ALCORITY, and ONETHIRTYONE who has withheld his identity from the public domain.

13.    At all relevant times, the Corporate Defendants operated together as a single business enterprise, with the same employment policies, including Nondiscrimination/Anti-Harassment policies.

14.    At all relevant times, Corporate Defendants engaged in a regular practice of forcing employees who have been subjected to harassment/discrimination at the hands of a fellow employee to confront the perpetrator of such conduct, thereby subjecting the victim to severe psychological trauma and further harassment, discrimination and humiliation.

3

15.     At all relevant times, defendant John Doe was personally and intimately involved in the affairs of the Corporate Defendants as to the manner in which the Corporate Defendants handled issues related to their employment policies, including Nondiscrimination/Anti-Harassment policies, and personally directed upper management as to the manner in which such issues would be handled - - this was done via John Doe's proxies, to wit: the Chief Executive Officers of the Corporate Defendants.

16.     At all relevant times, the Corporate Defendants employed more than fifteen persons, and were an "employer" as envisioned by 42 U.S.C. § 2000e(b) and the New York City Human Rights Law.

17.     The Corporate Defendants' operations are interrelated and unified and are a single enterprise and/or joint employer of Plaintiff, having shared control and codetermining the essential terms and conditions of employment, including hiring, firing, pay and benefits, discipline, supervision and direction.

18.     At all relevant times, the Corporate Defendants were and continue to be an "enterprise engaged in commerce", interstate commerce and/or the production of goods for commerce within the meaning of Title VII of the Civil Rights Act of 1964.

19.     Upon information and belief, at all relevant times, the Corporate Defendants have had gross revenues in excess of $500,000.00

20.     At all relevant times, the Corporate Defendants have used goods and materials produced in interstate commerce, and have employed two or more individuals who handled these goods and materials.

4

21. Defendant SAMUEL MATHEWS ("Mathews") is an employee of the Corporate Defendants and at all relevant times, was Plaintiff's direct supervisor. As to Plaintiff's New York City Human Rights Law claims, Mathews is sued in his individual capacity.

## COMPLIANCE WITH PROCEDURAL REQUIREMENTS

22. Plaintiff timely filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on or about October 20, 2021, alleging race and color discrimination and retaliation.

23. The Department of Justice, Equal Employment Opportunity Commission, issued Plaintiff a Notice of Right to Sue dated December 3, 2021, thereby entitling Plaintiff to file a civil action in this Court.

24. Contemporaneously with the commencement of this action, Plaintiff served a copy of this filed Complaint on March 1, 2022, upon the New York City Commission on Human Rights and the Corporation Counsel of the City of New York, in accordance with N.Y.C. Admin. Code Section 8-502(c).

## GENERAL ALLEGATIONS

25. Plaintiff was employed by defendants on a full-time basis in defendants' information technology (IT) department where his responsibilities were enterprise resource planning software ("ERP") development and support between September of 2019 and August of 2021. Prior to working for defendants, Plaintiff had substantial industry experience (Plaintiff has sixteen [16] years industry experience as a hands-on solutions developer in financial accounting, including taxation, private equity across multiple country jurisdictions).

26.     Plaintiff's products and creations have been used to report financial information to multiple auditing firms, government agencies and financial regimes, including the Securities Exchange Commission ("SEC"), Commodity Futures Trading Commission ("CFTC") and the like.

27.     Plaintiff holds two degrees in finance and economics with licenses from CFTC Series 3 along with Microsoft certifications.

28.     Due to Plaintiff's extensive qualifications and experience in the industry, he was recruited directly from the Corporate Defendants' talent acquisitions department for placement within Corporate Defendants IT and ERP department.

29.     During his employment with defendants, Plaintiff was a diligent and hard-working employee. In recognition of this fact, he received substantial bonuses, for instance, within first four (4) months of his employment with Corporate Defendants, Plaintiff's work product and results thereof warranted an earlier than expected bonus and a 20% salary raise. By the end of Plaintiff's first year of employment, Plaintiff received an annual bonus of approximately $10,000.00.

30.     Plaintiff took off very little time for vacation or personal days, and in comparison to other team members and peers, Plaintiff had a more extensive scope of responsibilities and scope of work. Despite this, and as a direct result of the efforts made by Plaintiff's Supervisor, defendant Mathews, to influence HR and upper management, Plaintiff's other team members with a much more limited with scope of work were promoted ahead of Plaintiff.

6

31.     In the same vein and after Plaintiff's second year of employment Plaintiff received a lower bonus than the prior year and lower than that of Plaintiff's peers. Plaintiff also did not receive a salary raise while other, white and less qualified team members received raises.

32.     Nevertheless, during his employment with defendants, Plaintiff was subjected to a pattern of unfair/disparate treatment, harassment and discrimination by his supervisor, defendant Mathews, which created a hostile work environment. In addition, Plaintiff was subjected to unwarranted and novel disciplinary measures which other white members of his team (also under Mathews' supervision) were not subjected to.

33.     Ultimately, and after having raised these issues through the proper channels with Human Resources, Plaintiff was retaliated against for complaining about the discriminatory treatment, and he was terminated in August of 2021 for reasons that were motivated primarily by discriminatory attitudes.

34.     Soon after Plaintiff began working for defendants in or about September of 2019, it became very clear that, based upon his comments and actions, Mathews had prejudiced and stereotyped views of blacks as well as other minorities. For example:

> A.     On one occasion, Mathews referred to the persons working in his household to provide care for his family member as "servants".
>
> B.     Mathews engaged in a regular course of conduct where he was constantly 'rewriting history' as to the facts of events involving Plaintiff so that Mathews could develop a narrative of Plaintiff allegedly being lazy, constantly late, full of excuses, someone who places the blame for problems upon others and ultimately is unqualified for his duties.

35.     In addition to the foregoing, Mathews' unlawful behavior cannot be distilled down to a single event, but rather a pattern of unfair treatment, harassment, discrimination and retaliation.   Mathews' treatment of Plaintiff was noticeably different from that of Plaintiff's colleagues and peers.   The Human Resources (HR) of defendants, as well as the leadership of the defendants ignored Plaintiff's multiple reports of the discriminatory behavior. While not all inclusive, the following summary captures the essence of these accounts and details specific examples:

36.     When speaking with Plaintiff, Mathews used a specific abrasive, impatient and condescending tone, which was used only when conversing with Plaintiff. This occurred daily in both private and group meetings with colleagues, several of whom noticed. Despite initially having worked with Plaintiff on a daily basis for months (and eventually for almost two years) Mathews also deliberately and maliciously misnamed Plaintiff in public, calling him by someone else's name, making it clear to the public and Plaintiff's peers, clients and colleagues that Mathews did not believe that Plaintiff was entitled to the basic human courtesy of getting Plaintiff's name right.

37.     Mathews' dehumanization tactics also manifested in the form of him engaging in a regular, continuous and pervasive practice of embarrassing Plaintiff and using Plaintiff as a scapegoat in front of Plaintiff's colleagues and clients. Mathews regularly questioned Plaintiff's professional capabilities in front of clients and colleagues – only to realize after such conduct that Plaintiff's recommendations, skillsets and processes for completing quality work were always efficient and effective.

38.     For example, Mathews insisted on joining some of Plaintiff's calls with Corporate Defendants' portfolio companies and frequently questioned Plaintiff in front of the clients in an effort to cast doubt on Plaintiff's abilities and present Plaintiff in unfavorable light. On multiple occasions, Mathews told Plaintiff that he was doing the work wrong, then walked through a list of tasks which Plaintiff had already completed, only to end up at the same conclusion that Plaintiff had previously reached - - this was done in front of clients and team members in an effort to embarrass, humiliate and publicly abuse Plaintiff.

39.     Mathews' fervent dislike for Plaintiff and his desire to find fault with Plaintiff's work and parade Plaintiff's (non-existent) errors or omissions for the world to see had even become apparent to Corporate Defendants' portfolio company clients, who had confided to Plaintiff privately and without Plaintiff's prompting, that Mathews' animus and hostile behavior toward Plaintiff was palpable.

40.     Mathews, without reason, except for his own bias toward black people, irrationally questioned Plaintiff's integrity and both directly and indirectly called Plaintiff a liar publicly, in front of Plaintiff's fellow team members during video conferences and privately during Plaintiff's one-on-one video conferences with Plaintiff. In one particular instance, and while not engaging in the same type of scrutiny with Plaintiff's other white team members, Mathews questioned if Plaintiff completed a data import task assigned to him.  Plaintiff confirmed completion of the task, however, Mathews could not accept that the task was completed in a way that was more effective and efficient than Mathews' antiquated method. As such, Mathews forced Plaintiff to share Plaintiff's screen with him and the team, and show everyone how Plaintiff completed the task, click by click - - at no time did Mathews ever enforce such a requirement on Plaintiff's other white team members. Mathews

then stated how his "trust was broken" (without explaining why such "trust" was allegedly broken and without giving Plaintiff a reason for Mathews to doubt Plaintiff) and then began to berate Plaintiff in front of Plaintiff's team members and proceeded to delete all Plaintiff's work just to make Plaintiff redo the task, using Mathews' outdated and time consuming method, the following night.

41.     On the same above-described event, Plaintiff's other white team members did not complete the task assigned to them, and one of Plaintiff's team members stated that they did not even look at the project site (evidencing negligence by that team member who could not even begin their work without looking at the project site)- - this was met with silence by Mathews who otherwise would have certainly chastised, berated, and humiliated Plaintiff for such a failure given Mathews' pattern of finding non-existent faults with Plaintiff's work products and making disparaging and often public remarks. This specific pattern of unwarranted scrutiny towards Plaintiff's work (while other white team members were not given any special attention by Mathews, except praise and promotions for mediocre work) combined with extended sessions of humiliation, hostility and abuse by Mathews occurred on a regular basis, for example, five incidents of such kind in a period of one month.

42.     Mathews engaged in a regular practice of shadowing Plaintiff, specifically instructing Plaintiff's teammates to unexpectedly join Plaintiff's client calls to eavesdrop and provide Mathews with updates when he was unable to participate himself. This was a conspicuous demonstration of Mathews' hostility to Plaintiff and unwarranted mistrust for Plaintiff's professional skills.   This shadowing was designed to maximize the hostile pressure on Plaintiff and achieve maximum publication of Plaintiff's humiliation as well as underscore the latter's diminished worth to Mathews.

43.     Despite the fact that the team under Mathews' supervision had three separate ticketing systems to log their work and update clients on projects, Mathews forced Plaintiff (and Plaintiff alone) to keep a separate Excel spreadsheet detailing Plaintiff's hours of every day so he could "make sure [Plaintiff] was doing what [Plaintiff] said [he] was doing." No other colleague on Plaintiff's team was ever asked to provide the same Excel spreadsheet of hourly time tracking; this was an unnecessary and discriminatory practice imposed specifically on Plaintiff, despite several internal project management metrics which consistently showed that Plaintiff singlehandedly (on his own and without the participation of the rest of the team) completed 60%-65% of the total tasks and projects for the largest department in the company.

44.     Mathews forced Plaintiff to do extra work that required large amounts of time that was not required of any other team members (and for which extra work Plaintiff was not given compensation). A good example was a template to be used by the team for all projects. The creation of the Functional Design Documentation template memorializes a process that was intended for the entire team and Plaintiff was tasked with creating the template, however, Plaintiff was the only one that was ever required to use it or any other documentation for the team's projects. This includes meeting minutes, project scope, user guides, testing scenarios, one page cheat sheets and training manuals - - all of which Plaintiff was required to create and use and which other, white team members were neither required to create nor use.

45.     Mathews consistently painted a picture of Plaintiff as lazy, slow and frequently responded to Plaintiff's questions with insults, including and not limited to: "that is the dumbest thing I ever heard."  The first of such incidents occurred on November 22, 2019 while Plaintiff volunteered to work late before the Thanksgiving holiday to allow other team members time off.

46.     Mathews consistently denied Plaintiff access to professional development related resources, training and meetings that other team members were offered to pursue advancement in their careers, and example of one such incident taking place on June 7, 2021.

47.     Mathews humiliated Plaintiff on team meetings, asking why Plaintiff's tickets are not updated from Plaintiff's calls earlier that day while ignoring the imbalanced workload imparted upon Plaintiff, and at the same time neglecting the poor performance and consistently late (often by months) completion, notations, comments and contact from other team members, for example one such incident taking place on April 20, 2020.  The first of such occurrences date back to November of 2019.

48.     Mathews engaged in a regular practice of blind calling Plaintiff on Plaintiff's personal cell phone off work hours and sometimes over the weekend asking about Plaintiff's projects, which Plaintiff often worked on overnight, on vacation days and on weekends. Mathews did not engage in such a practice with other, white team members.

49.     At first, Mathews' practice of blind calling Plaintiff was infrequent and limited to once a week, but soon grew to 2-3 times on average a week. On one occurrence on January 5, 2021, Mathews' tone with Plaintiff was so disturbing that Plaintiff suggested that Mathews involve Human Resources to review all the "extra work" and the unprofessional language and tone directed at Plaintiff. Mathews then convinced Plaintiff that would not be

necessary and proceeded to temporarily stop the behavior, which significantly improved their interactions for a short period of time.  Approximately two weeks later, Mathews returned to the same behavior and hostile attitude toward Plaintiff.

50.     Mathews regularly and without a basis for doing so, scrutinized and questioned Plaintiff's work schedule and questioned the amount of time spent on a project despite Plaintiff's high-volume productivity and limited paid time off, while other team members were not so questioned, provided a lighter workload and encouraged to enjoy their vacations. Significantly, while Plaintiff worked nights, weekends (and while forced to work during a funeral and when grieving the death of his grandfather), and during paid time off to handle his workload and ensure the completion of his assigned projects, Plaintiff's white colleagues were allowed to join team meetings despite having missed deadlines, without consequences. One team member, who Mathews favored, missed meetings, for "retail therapy" or "going to the beach" and was not questioned while her workload frequently fell onto the shoulders of Plaintiff and his colleagues.

51.     Plaintiff was personally denigrated, devalued and humiliated approximately fifteen (15) to twenty (20) times per week by Mathews both publicly in front of Plaintiff's fellow team members during video conferences and privately during Plaintiff's one-on-one video conferences with Plaintiff, when Mathews maliciously and deliberately misnamed Plaintiff, calling Plaintiff by someone else's name (making it crystal clear that he considered Plaintiff unworthy of even the basic human courtesy of getting Plaintiff's name right).

52.     On several occasions, Mathews engaged in half-truth stories to get other team members to join in on ridiculing and hazing Plaintiff. The last (and not only) occurrence of this was on June 13, 2021 and was the most painful. Plaintiff organized a meeting between

13

two coworkers after work hours, to coordinate resources to support another team member who was beginning chemotherapy. As usual, Mathews, who was not invited to the meeting, joined the call 20 minutes into the call, changed the topic of the meeting and proceeded to tell a series of caustic jokes about Plaintiff causing everyone to laugh at Plaintiff's expense. Plaintiff remained on mute for the remainder of the call to make sure nobody could hear or see Plaintiff crying.

53.     A specific example of the foregoing was when Mathews incorrectly recalled the events of an earlier meeting with a client whom Mathews insisted on supervising, by claiming Plaintiff had not been prepared resulting in the meeting allegedly being delayed. During his twisted recollection of that meeting, Mathews failed to mention the fact that a forced update had been sent to Plaintiff's work laptop which caused the Plaintiff to reboot and restart the meeting 5 minutes later - - in reality, this caused only a minor delay and the meeting nevertheless concluded on time and with the client's approval. In his rabid lather to embarrass Plaintiff and proclaim for the world: "here we go again, Aaron is late and unprepared again" Mathews again rewrote history to fit his racist and bigoted narrative of Plaintiff.

54.     Mathews, driven to see Plaintiff fail in order to present Plaintiff in the worst possible light, withheld from Plaintiff information and tools which Plaintiff needed in order to complete his job successfully, while he did not withhold such information and tools from other white team members. For example, Mathews intentionally did not provide Plaintiff access to proper training for a critical license without explanation (which Plaintiff needed in order to complete his job successfully), while Plaintiff's fellow team members, who are less qualified were allowed to complete such training and subsequently received promotions.

14

55.    On several occasions in or about June of 2021 and after a few weeks of expressing to Mathews that several tasks and projects had gone unanswered by teammates, Mathews took a distinctive hard tone. Specifically, after asking Plaintiff a question on a project, Mathews immediately cut Plaintiff off mid-sentence and engaged a fifteen-minute-long abusive rant, which concluded with Mathews accusing Plaintiff of "putting words in [Mathews'] mouth".

56.    In response to Plaintiff having provided proof of the bug to Mathews, Mathews retaliated by putting Plaintiff under performance improvement review, citing allegedly poor work performance and failure to communicate with clients. This performance review was arbitrary and capricious, lacking objective goals, benchmarks or peer comparison and was simply meant to set Plaintiff up for failure.

57.    Plaintiff immediately brought up his concerns with Human Resources in June of 2021 regarding both his treatment by Mathews and the wording on the performance review.  Plaintiff provided Human Resources with clear dates and names of incidents of discrimination.  Plaintiff also brought up his concern of the arbitrariness of the performance review since Plaintiff outperformed every team member in every category of the performance issues brought against Plaintiff.

58.    On or about June 17, 2021, Human resources informed Plaintiff that they would conduct an investigation and get back to Plaintiff. They also informed Plaintiff that the performance review was subject to weekly updates from Plaintiff's supervisor for a course of four weeks.

59.     Three weeks later, Plaintiff was terminated. Approximately one week prior to the termination, Plaintiff only received one review directly from Mathews who stated the *improvements* that Plaintiff had made. This was another form of psychological abuse as it was confirmed that Mathews had no intention of improving anything about Plaintiff's performance as he use the performance improvement plan to set up the false rationale for termination while verbally giving Plaintiff positive feedback.

***Other Examples of Discrimination Which Occurred Prior to Plaintiff's Termination***

60.     Plaintiff was regularly excluded from team celebratory event(s) for projects in which Plaintiff played a key role. The most disheartening example is on April 30, 2021 when Plaintiff was on a call with the financial controller of Corporate Defendants asking why Plaintiff was absent from the release party for a project that Plaintiff and many of Plaintiff's team members had been working on for nine months, since everyone else had attended the release party except Plaintiff. Plaintiff's notes from the previous week indicated that Mathews stated that he was going into the office at the request of his boss and needed to end the meeting early to take a COVID test.  It became apparent that not only was Plaintiff not invited, but Mathews went out of his way to avoid mentioning the event to Plaintiff and ensure he would not learn of or attend the team celebration.

61.     On November 27, 2019, while working late on the day before Thanksgiving, Plaintiff asked Mathews a question about an Electronic Fund Transfer setup for a major corporate client known as "Island Abbey Foods". His reply was, "That's the dumbest thing I ever heard" which was immensely hurtful and embarrassing.

62.     In or about May of 2020, and due to the errors of a white team member which resulted in delays in the process of working on a Lockbox Project (and who admitted her lack of understanding of the project), Plaintiff was scapegoated and blamed for the problem by Mathews who subsequently took over the project with Sandra. Two months later, Mathews and Sandra concluded that Plaintiff had nothing to with the errors and delays, but Plaintiff was nevertheless chastised and belittled for allegedly "for not being a functional expert."

63.     On or about September 22, 2020, occurred the first of many examples of Mathews deliberately setting Plaintiff up for failure, and in this instance, during the course of the team's implementation of Microsoft Dynamics 365 ("D365"). Plaintiff was led to believe that he was brought to the D365 meetings in order to help out; however, Plaintiff was instead thrown into several meetings with little or no information, and was advised to jot down his questions and schedule follow-up meetings in order to get brought up to speed. While Plaintiff did as instructed and scheduled follow-up meetings in an attempt to gain answers and information, no one attended Plaintiff's meetings and his questions were never answered.

64.     In or about October of 2020, and at Mathews' direction and request, a white team member handed off her portion of a Versa AP solution project to Plaintiff. The team member instructed Plaintiff to email Versa and explain to them that Plaintiff was going to work on the project and that she "need[ed] to step away from this project." Put simply, she handed off her project to Plaintiff without informing the client, and Plaintiff received no reply or information from Mathews about this project. Two weeks later, in November of 2020, Mathews pointed blame at Plaintiff that this project was now behind, and how Plaintiff

needed to get it done, while completely ignoring the fact that Sandra decided to "step away" on her own with no briefing or transition meeting, leaving Plaintiff scrambling.

65.     In or about November of 2020, and despite Plaintiff agreeing to attend twice-a-day calls on his vacation, Mathews decided to berate Plaintiff upon Plaintiff's return for missing one call on a Friday. He once again brought up the Versa project that is behind and to make sure to stay on target for December go-live.

66.     In or about December of 2020 Mathews indicated that Plaintiff needed to fill in a weekly spreadsheet detailing my activities to "confirm what [Plaintiff] was doing all day" - - a practice not required of anyone else on Plaintiff's team or in Plaintiff's department, and despite the fact that all of Plaintiff's work is recorded and tracked in the system, and Plaintiff clearly had the highest volume of work and output than other team members, yet Plaintiff was again being singled out.

67.     On January 5, 2021, and after addressing an error in D365 and explaining to Mathews the steps Plaintiff took to address the error, Mathews did not believe Plaintiff. Plaintiff then shared my screen with him, showing him step-by-step, everything which Plaintiff did in order to address the error, only for Mathews to say "the trust is broken."

68.     Plaintiff's team member Sandra received preferential treatment from Mathews. For example, in an incident similar to the one described above, she had work items that did not get loaded and she openly acknowledged on the call she was unaware of work items assigned to her, stating "I really need to pay attention to the board." She consistently failed to attend meetings, showed up late, was unable to carry her workload, did not get assigned nearly the volume of work assigned to Plaintiff, and she was neither shamed, embarrassed, harassed, nor berated.  She constantly made mistakes and needed Plaintiff and

other team members to jump into her projects to save them, and took frequent time off – yet she was always consistently celebrated and credited by Sam.

69.     Continuing into January of 2021, Plaintiff's team members Sandra and Justin consistently missed the deadlines for their assigned tasks, only to be met with silence from Mathews. If Plaintiff were to be late with the same tasks, this would be paraded in front of others, and Plaintiff would be harassed, humiliated, berated and embarrassed in front of Plaintiff's other co-workers who were not involved to make sure everyone knew how Plaintiff screwed something up or was late. During this time, Plaintiff was again reminded by Mathews to fill in Plaintiff's spreadsheet of weekly tasks, not required of anyone else, and he again consistently misnamed Plaintiff, calling Plaintiff by someone else's name to humiliate and degrade Plaintiff in front of others. Plaintiff was also again given disparate treatment when Mathews forced Plaintiff to enter data into forms which neither Plaintiff's team members were ever required to use, nor Plaintiff's department (to wit: data normally entered by portfolio companies of the Corporate Defendants, and not by software engineers such as Plaintiff and his team members).

70.     Later in January of 2021, Sandra continued to be late with her tasks, only to be met with silence from Mathews while Plaintiff would otherwise be harassed, berated and humiliated. That month, while Plaintiff was updating a task known as "JIRA," Plaintiff was able to see, using a search on JIRA for other users on Plaintiff's team, that only Plaintiff's JIRA tasks were the focus of Mathews' attention while the tasks of Plaintiff's fellow team members were not.

71.     In March of 2021, and after several months of battling COVID, Plaintiff's grandfather passed away. Plaintiff told his team and most of them sent their condolences. It was very noticeable that Mathews was very silent on the situation until two weeks later.

72.     Between May and June of 2021, the disparate treatment and setting Plaintiff up for failure continued.  For example, new projects were taken away from Plaintiff and replaced with older failing projects previously belonging to others so that Plaintiff could be saddled with the blame for their imminent failure. Additionally, and due to a team member's incompetence, the entire team was forced to work after hours on multiple nights in order to save her project at the last minute. During a call, this team member noted how she "was not going to be in this week since she "spent the day at the beach yesterday", only to be met with laughter by Mathews.

73.     After raising these issues with Corporate Defendants' HR Department on June 17, 2021, Plaintiff was subsequently terminated without notice on August 3, 2021.

**Defendants' Business**

74.     At all relevant times, Defendants have been in business of operating a private investment firm that invests in businesses across a range of industries.

75.     Defendants' businesses are operated and marketed by Defendants as a common enterprise. Each of the above businesses are advertised jointly on Defendants' website (https://doriltongroup.com/).

76.      Employees were freely interchangeable, the various business operations were marketed as Dorilton Capital, Dorilton Ventures and Doreilton Motor Sports, and all employees were paid by the same or substantially similar payroll methods.

77.     Upon information and belief, Defendants operate all of their businesses through common management, ownership and financial control.

**FIRST CAUSE OF ACTION**
**<u>TITLE VII CLAIM FOR HOSTILE ENVIRONMENT</u>**

78.     Plaintiff repeats and realleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

79.     The acts more particularly alleged in the preceding paragraphs constitute hostile work environment and discrimination as proscribed by Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991.

80.     The adverse treatment to which Plaintiff was subjected was based upon his being black and of Jamaican decent.

81.     The conduct of defendants deprived Plaintiff of his statutory rights under 42 U.S.C. § 2000e, *et seq*., i.e., in that Plaintiff, by being subjected to the adverse treatment more particularly alleged above, was affected in a "term, condition or privilege" of employment.

82.     As a direct, natural, proximate and foreseeable result of the actions of defendants, Plaintiff has suffered past and future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

WHEREFORE, Plaintiff prays that this Court will enter a judgment for Plaintiff and against defendants for the following relief:

A.     An award of damages, including but not limited to loss of wages, benefits, and promotional opportunities, and reinstatement or an award of front pay to compensate Plaintiff for loss of future salary and benefits and career opportunities;

B.     An award of damages for mental anguish, humiliation, embarrassment, and emotional injury;

C.    An award of punitive damages;

D.    An award of reasonable attorneys' fees and the costs of the action; and

E.    Such other and further relief as the Court may demand just and proper.

## SECOND CAUSE OF ACTION
## TITLE VII CLAIM FOR RETALIATION

83.    Plaintiff repeats and realleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

84.    Plaintiff, by being subjected to the adverse treatment by defendants more particularly described above, was affected in a "term, condition or privilege of employment," as proscribed by 42 U.S.C. § 2000e-2(a)(l), based on the fact that he opposed a practice that he reasonably believed was unlawful under Title VII and was fired for doing so.

85.    As a direct, natural, proximate and foreseeable result of the actions of defendants, Plaintiff has suffered past and future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

WHEREFORE, Plaintiff prays that this Court will enter a judgment for Plaintiff and against defendants for the following relief:

A.    An award of damages, including but not limited to loss of wages, benefits, and promotional opportunities, and reinstatement or an award of front pay to compensate Plaintiff for loss of future salary and benefits and career opportunities;

B.    An award of damages for mental anguish, humiliation, embarrassment, and emotional injury;

C.    An award of punitive damages;

D.    An award of reasonable attorneys' fees and the costs of the action; and

E.    Such other and further relief as the Court may demand just and proper.

**THIRD CAUSE OF ACTION**
**NEW YORK CITY HUMAN RIGHTS LAW CLAIM FOR HOSTILE WORK ENVIRONMENT**

86.     Plaintiff repeats and realleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

87.     The acts more particularly alleged in the preceding paragraphs constitute hostile work environment and discrimination as proscribed by the New York City Human Rights Law.

88.     The adverse treatment to which Plaintiff was subjected was based upon his being black and of Jamaican decent.

89.     Defendant Mathews engaged in the discriminatory practices described above, participated in the discriminatory practices of Corporate Defendants, and aided and abetted the discriminatory practices.

90.     The conduct of Defendants deprived Plaintiff of his statutory rights under the New York City Human Rights Law, i.e., in that Plaintiff, by being subjected to the adverse treatment more particularly alleged above was affected in a "term, condition or privilege of employment," as proscribed by N.Y.C. Admin. Code § 8-107(1)(a).

91.     As a direct, natural, proximate and foreseeable result of the actions of defendants, Plaintiff has suffered past and future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

WHEREFORE, Plaintiff prays that this Court will enter a judgment for Plaintiff and against defendants for the following relief:

>     A.     An award of damages, including but not limited to loss of wages, benefits, and promotional opportunities, and reinstatement or an award

of front pay to compensate Plaintiff for loss of future salary and benefits and career opportunities;

B.   An award of damages for mental anguish, humiliation, embarrassment, and emotional injury;

C.   An award of punitive damages;

D.   An award of reasonable attorneys' fees and the costs of the action; and

E.   Such other and further relief as the Court may demand just and proper.

## FOURTH CAUSE OF ACTION
## NEW YORK CITY HUMAN RIGHTS LAW CLAIM FOR RETALIATION

92.   Plaintiff repeats and realleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

93.   Defendant Mathews engaged in the discriminatory practices described above, participated in the discriminatory practices, and aided and abetted the discriminatory practices.

94.   Plaintiff, by being subjected to the adverse treatment by defendants more particularly described above, was deprived of his rights under the New York City Human Rights Law, based on the fact that he opposed a practice that he reasonably believed was unlawful under the New York City Human Rights Law and was fired as a result.

95.   As a direct, natural, proximate and foreseeable result of the actions of defendants, Plaintiff has suffered past and future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

WHEREFORE, Plaintiff prays that this Court will enter a judgment for Plaintiff and against defendants for the following relief:

A.   An award of damages, including but not limited to loss of wages, benefits, and promotional opportunities, and reinstatement or an award

of front pay to compensate Plaintiff for loss of future salary and benefits and career opportunities;

B.   An award of damages for mental anguish, humiliation, embarrassment, and emotional injury;

C.   An award of punitive damages;

D.   An award of reasonable attorneys' fees and the costs of the action; and

E.   Such other and further relief as the Court may demand just and proper.

## FIFTH CAUSE OF ACTION
## INFLICTION OF EMOTIONAL DISTRESS

96.   Plaintiff repeats and realleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

97.   Defendant Mathews intended, by harassing Plaintiff, to cause him to suffer severe mental and emotional distress.

98.   Because of Mathews' harassment of the Plaintiff, Plaintiff suffered severe mental and emotional distress.

99.   Plaintiff objected to the conduct and complained of it to Corporate Defendants, Human Resources and other supervisory staff.

100.   Because of the aforementioned complaints Corporate Defendants had knowledge of the acts causing Plaintiff mental and emotional distress, but refused to take corrective or remedial action.

101.   Corporate Defendants therefore acquiesced in the conduct of its subordinates causing Plaintiff severe mental and emotional distress.

102.   As a result of the defendants' unlawful conduct, Plaintiff has suffered economic and non-economic damages, including lost pay and mental and emotional pain and suffering, for which he is entitled to an award of compensatory damages, back pay, attorney's

fees and costs, and other legal and equitable relief. Plaintiff also is entitled to an award of punitive damages to punish the defendants for their unlawful conduct and to deter them from engaging in similar unlawful conduct in the future.

WHEREFORE, Plaintiff prays that this Court will enter a judgment for Plaintiff and against defendants for the following relief:

A.  An award of damages, including but not limited to loss of wages, benefits, and promotional opportunities, and reinstatement or an award of front pay to compensate Plaintiff for loss of future salary and benefits and career opportunities;

B.  An award of damages for mental anguish, humiliation, embarrassment, and emotional injury;

C.  An award of punitive damages;

D.  An award of reasonable attorneys' fees and the costs of the action; and

E.  Such other and further relief as the Court may demand just and proper.

### SIXTH CAUSE OF ACTION
### TORTIOUS INTERFERENCE WITH A PROSPECTIVE ECONOMIC ADVANTAGE

103.   Plaintiff repeats and realleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

104.   As set forth herein, and due to his background and longtime presence in the IT industry, Plaintiff had a reasonable expectation of entering into a valid business relationship with prospective customers, clients, or new employers.

105.   As set forth herein, and due to their close relationship, defendant Mathews was aware that Plaintiff had a reasonable expectation of entering into a valid business relationship with prospective customers, clients, or new employers.

106.   As set forth herein, defendants' purposeful interference prevented Plaintiff's legitimate expectancy from ripening into valid business relationships with numerous prospective customers, clients, or new employers.

107.   As a result thereof, Plaintiffs has suffered damages in an amount to be determined at trial, including costs, disbursements, and attorneys' fees.

WHEREFORE, Plaintiff prays that this Court will enter a judgment for Plaintiff and against defendants for the following relief:

- A.   An award of damages, including but not limited to loss of wages, benefits, and promotional opportunities, and reinstatement or an award of front pay to compensate Plaintiff for loss of future salary and benefits and career opportunities;
- B.   An award of damages for mental anguish, humiliation, embarrassment, and emotional injury;
- C.   An award of punitive damages;
- D.   An award of reasonable attorneys' fees and the costs of the action; and

E.   Such other and further relief as the Court may demand just and proper.

## SEVENTH CAUSE OF ACTION
## DEFAMATION

108.   Plaintiff repeats and realleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

109.   Defendant Mathews defamed Plaintiff when he published statements as set forth above, calling Plaintiff a liar, dumb, lazy, constantly late, full of excuses, someone who places the blame for problems upon others and someone who ultimately is unqualified for his duties, and asserted to all team members and clients of the Corporate defendants, and in particular, to members of the very small niche community within Plaintiff's area of technical expertise, that Plaintiff was not fit to work within this limited community and area of

expertise, even if it was for other employers.

110.   When Mathews published/posted the foregoing statements, he was aware that thousands of people could potentially learn of them, and believed that Plaintiff would lose current or prospective job opportunities as a result of his statements, even though his statements were false.

111.   Plaintiff has suffered damages because of Mathews' statements in that Plaintiff's career and future career prospects in the industry have been destroyed and Plaintiff has now completely been banned/blacklisted and is no longer able find work in his line of business, and the estimated loss of this work and future career prospects in the industry is no less than Thirty Million Dollars ($30,000,000.00).

112.   By reason of the foregoing and by reason of Mathews' defamation of Plaintiff, Plaintiff has been damaged in an amount not less than that of Thirty Million Dollars ($30,000,000.00) to be determined at trial.

113.   As a direct, natural, proximate and foreseeable result of the actions of defendants, Plaintiff has suffered past and future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court will enter a judgment for Plaintiff and against defendants for the following relief:

> A.   An award of damages, including but not limited to loss of wages, benefits, and promotional opportunities, and reinstatement or an award of front pay to compensate Plaintiff for loss of future salary and benefits and career opportunities;
>
> B.   An award of damages for mental anguish, humiliation, embarrassment, and emotional injury;

C.     An award of punitive damages;

D.     An award of reasonable attorneys' fees and the costs of the action; and

E.     Such other and further relief as the Court may demand just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands

a trial by jury on all questions of fact raised by the complaint.

Dated:      Brooklyn, New York
            March 1, 2022

Respectfully submitted,

/s/  Marcus Aurelius Nussbaum
Marcus A. Nussbaum, Esq. (MN 9581)
Ilya Fishkin, Esq. (IF 4948)
169 Commack Road, Ste. H371
Commack, New York 11725
Tel: 201-956-7071
Fax: 347-572-0439
marcus.nussbaum@gmail.com
*Attorneys for Plaintiff*