UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: _10/18/22_

---

AARON HARDING,

　　　　　　　　　　　Plaintiff,

　-against-

DORILTON CAPITAL ADVISORS LLC,
DORILTON CAPITAL MANAGEMENT LLC,
ALCORITY LLC, ONETHIRTYONE LLC,
SAMUEL MATHEWS and John Doe, *the unnamed
owner of the Dorilton Corporate Entities Whose
Identity Has Been Withheld*, Jointly and Severally,

　　　　　　　　　　　Defendants.

No. 22 Civ 01726 (CM)

---

**DECISION AND ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANTS' MOTION TO DISMISS AND DENYING PLAINTIFF'S
MOTION FOR LEAVE TO AMEND**

McMahon, J.:

　　Plaintiff Aaron Harding sues his former employer (the Dorilton Corporate Entities), Dorilton's unknown owner (John Doe), and his former supervisor (Samuel Mathew) (together, "Defendants"), for employment discrimination on the basis of Plaintiff's race and Jamaican ethnicity/ancestry/national origin, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the New York City Human Rights Law ("NYCHRL"). Plaintiff also sues under New York state law for the torts of infliction of emotional distress, tortious interference with a prospective economic advantage, and defamation. Plaintiff seeks an award of compensatory damages, punitive damages, and attorney's fees.

Defendants move to dismiss Plaintiff's action for failure to state a claim. Plaintiff opposes the motion and cross-moves for leave to file an amended complaint.

Defendants' motion to dismiss the Complaint is granted in part and denied in part. Plaintiff's cross-motion for leave to amend the Complaint is denied.

## BACKGROUND

### I.   Parties

Plaintiff Aaron Harding is a Black individual of Jamaican ancestry and national origin. Complaint ("Compl.") ¶ 6. Harding was employed by Defendants Dorilton Capital Advisors LLC, Dorilton Capital Management LLC, Alcority LLC, and OneThirtyOne LLC (collectively "Dorilton Group Enterprise" or "Dorilton") in their information technology ("IT") department from September 2019 to August 2021. *Id.* ¶¶ 7-11, 25. Harding held his position in the IT department until he was fired in August 2021. *Id.* ¶¶ 33, 73. Before he was hired by Dorilton, Harding had "sixteen years industry experience as a hands-on solutions developer" in financial accounting across multiple jurisdictions. *Id.* ¶ 25.

Defendant Dorilton Capital Advisors LLC ("DCA") is a Connecticut limited liability company with its principal place of business in New York, NY. Compl. ¶ 7.

Defendant Dorilton Capital Management LLC ("DCM") is a Delaware limited liability company with its principal place of business in New York, NY. Compl. ¶ 8.

Defendant Alcority LLC ("Alcority") is a Delaware limited liability company with its principal place of business in New York, NY. Compl. ¶ 9.

Defendant OneThirtyOne LLC ("OneThirtyOne") is a Delaware limited liability company with its principal place of business in New York, NY. Compl. ¶ 10.

Defendants DCA, DCM, Alcority, and OneThirtyOne allegedly operate all of their businesses through common management, ownership and financial control and employees are freely interchangeable across their various business operations. Compl. ¶¶ 13, 76-77. Dorilton is a private investment firm that invests in businesses across a range of industries. *Id.* ¶ 74.

Defendant John Doe[1] is the owner of Dorilton. Compl. ¶ 12.

Defendant Samuel Mathew[2] is an employee of Dorilton and, for the duration of Harding's time at Dorilton, was Harding's direct supervisor. Compl. ¶ 21.

## II.   **Factual Background**

Harding was hired by Defendants Dorilton in September 2019, to serve in Dorilton's IT and enterprise resource planning ("ERP") department. Compl. ¶¶ 25, 28. Throughout Harding's time at Dorilton, he was under the direct supervision of Samuel Mathew. *Id.* ¶ 21.

Harding alleges that, during the course of his employment with Dorilton, Mathew subjected him to a pattern of unfair/disparate treatment, harassment and discrimination. Compl. ¶ 32. Harding alleges that Mathew's treatment of him was noticeably different from his treatment of subordinates who were white. *Id.* ¶ 32, 35. Harding further alleges that Mathew's comments and actions were a result of Mathew's prejudiced and stereotyped views of blacks and other minorities, and that Mathew demonstrated these views through (i) on one occasion, referring to the persons working in his household to provide care for his family member as "servants"; (ii) engaging in a regular course of conduct where he was constantly altering the facts pertinent to events involving Harding ("rewriting history") so that Mathew could develop a narrative that Harding was lazy,

---

[1] The Clerk of Court rejected the request for the issuance of a "John Doe" summons, and as far as the court is aware, no effort has been made subsequently to learn the name of this individual.

[2] Defendants' Memorandum of Law in support of their Motion to Dismiss Plaintiff's Complaint ("Mem.") notes that the Complaint misspells the name of Harding's supervisor as "Mathews" Dkt. No. 25, at 1. I will spell his name as Mr. Mathew spells it, and direct the Clerk of Court to amend the caption so that it, too, uses the correct name.

constantly late, full of excuses, and someone who blamed others for problems he caused – in short, as unqualified for his duties. *Id.* ¶ 34.

Harding alleges that he was passed over for promotion, did not receive salary raises that his white team members received, was consistently denied access to resources for professional development that other team members were offered, and was subject to unwarranted and novel disciplinary measures that were not imposed on white team members under Mathew's supervision. *Id.* ¶¶ 30, 32-33, 46. For example, while Harding received a bonus after his first year of employment, after his second year of employment Harding received a bonus that was both lower than the prior year's and lower than that received by his peers. *Id.* ¶¶ 30-31. Harding also did not receive a salary raise that other, white, and allegedly less qualified team members received. *Id.* ¶ 31. With respect to professional development, Mathew intentionally did not provide Harding with access to proper training for a critical license, which Harding needed to complete his job successfully; Harding's white team members were allowed to complete the training and subsequently received promotions. *Id.* ¶ 54.

In general, Harding alleges that Mathew used an abrasive, impatient and condescending tone when conversing with him, both privately and in group meetings. Compl. ¶ 36. Despite working with Harding on a daily basis, Mathew deliberately and consistently misnamed Harding in public. *Id.* ¶¶ 36, 69. He regularly painted a picture of Harding as lazy and slow, and frequently responded to Harding's questions with insults, such as, "That is the dumbest thing I have ever heard." *Id.* ¶ 45. Mathew encouraged other team members to join him in ridiculing and hazing Harding. For example, on one occasion, he told a series of caustic jokes about Harding on a team call, causing everyone to laugh at Harding's expense. *Id.* ¶ 52. Harding was regularly excluded from team celebratory events after completion of projects in which he played a key role. *Id.* ¶ 60.

Mathew routinely embarrassed Harding and using him as a scapegoat in front of clients. He would join client calls in order to question Harding in front of clients and so cast doubt on Harding's abilities. *Id.* ¶¶ 37-38. As a result of Mathew's actions, portfolio company clients confided to Harding privately and without prompting that Mathew's animus and hostile behavior towards Harding was palpable. *Id.* ¶ 39.

Harding took very little time for vacation and personal days in comparison to his peers, and he had a more extensive scope of responsibilities and work. Compl. ¶¶ 29-30, 50. Despite this, Mathew allegedly demonstrated a pattern of unwanted scrutiny towards Harding's work, often combined with disparaging public remarks. *Id.* ¶¶ 41, 50. For example, on one occasion, after questioning whether Mathew had completed a specific data import task, Mathew required that Harding share his screen with the team and demonstrate exactly how the task had been completed. Mathew subsequently berated Harding, stating that "his trust was broken" and proceeded to delete all of Harding's work so that Harding had to redo the task using another method Mathew preferred. *Id.* ¶ 40. By contrast, when Harding's white team members stated that they had not begun the task, Mathew remained silent. *Id.* ¶ 41.

Mathew forced Harding to complete extra projects that were not required of other team members. For example, Harding was tasked with creating the Functional Design Documentation template memorializing processes for the entire team. Compl. ¶ 44. However, Harding was the only one ever required to use it. *Id.* Harding also alleges that he was scapegoated and blamed for errors that were committed by his white team members on projects that Harding was required to take over from these team members. *Id.* ¶¶ 62, 64. Generally, Harding alleges that new projects were taken away from him and replaced with older, failing projects, so that Harding could be blamed for their imminent failure. *Id.* ¶ 72. In contrast, Harding states that another team member

was not harassed or berated by Mathew even though she "failed to attend meetings, showed up late, was unable to carry her workload, [and] did not get assigned nearly the volume of work assigned to Plaintiff." *Id.* ¶ 68.

Mathew engaged in a regular practice of shadowing Harding and specifically instructed Harding's teammates to join Harding's client calls in order to provide Mathew with updates. Compl. ¶ 42. He further required that Harding use a separate Excel spreadsheet to track his hours of work. No other colleague was asked to use this Excel hourly time tracking system. *Id.* ¶ 43. Mathew would blind-call Harding on his personal cell phone outside of work hours. *Id.* ¶ 48. While at first this practice was infrequent, it increased to on average 2-3 times a week. *Id.* After one such call, Harding suggested that Mathew involve Human Resources to review all the "extra work" and the unprofessional language and tone directed at Harding. Mathew convinced Harding this would not be necessary and then stopped the behavior for a period of two weeks, after which time the calls and hostile attitude resumed. *Id.* ¶ 49.

### A.    Harding's Complaint to HR and Subsequent Termination.

On several occasions in June 2021, Mathew took a distinctive hard tone with Harding. In one instance, after asking Harding a question on a project, Mathew immediately cut Harding off mid-sentence and engaged in a fifteen-minute-long abusive rant. Compl. ¶ 55. Around this time, Harding provided proof of a "bug" to Mathew;[3] Mathew retaliated by putting Harding under a performance improvement review, citing allegedly poor work performance and failure to communicate with clients. *Id.* ¶ 56. This performance review lacked objective goals, benchmarks or peer comparison, and Harding alleges it was intended to set him up for failure. *Id.*

---

[3]    While the Complaint does not provide details on this bug, the court assumes that it was a bug in one of the programs the IT department at Dorilton dealt with.

Harding immediately raised his concerns with Human Resources ("HR") on June 17, 2021, addressing both his treatment by Mathew and the wording of the performance review. Compl. ¶¶ 57, 73. Harding provided HR with clear dates and names of incidents of discrimination. *Id.* He also brought up his concern of the arbitrariness of the performance review since Harding outperformed every team member in every category of the performance issues brought against Harding.

In response to the complaint, HR informed Harding that it would conduct an investigation and get back to him. Compl. ¶ 57. Representatives from HR also advised Harding that the performance review was subject to weekly updates from Mathew over a course of four weeks. *Id.* However, Harding only received one review, in which Mathew outlined the improvements that Harding had made. *Id.* ¶ 59. Harding alleges that this was a form of psychological abuse as Mathew was using the performance improvement plan to set up the false rationale for termination while giving Harding positive feedback verbally. *Id.*

On August 3, 2021 Harding was fired without notice. *Id.* ¶ 73. Harding asserts that he has not been able to secure employment in his line of business since his termination from Dorilton. *Id.* ¶ 111.

### III. Procedural Posture

In October 2021, Plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), alleging race and color discrimination and retaliation. The EEOC issued Plaintiff a Right to Sue Notice dated December 3, 2021.

Plaintiff initiated this action by filing a complaint on March 1, 2022. *See* Dkt. No. 1. Defendants moved to dismiss the Complaint on May 16, 2022. *See* Dkt. No. 24. On July 13, 2022,

Plaintiff opposed and moved for leave to amend the Complaint pursuant to Federal Rule of Civil Procedure 15. *See* Dkt. No. 30.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[A]ll reasonable inferences should be drawn in favor of the plaintiff," but the "complaint must contain sufficient allegations to nudge a claim 'across the line from conceivable to plausible.'" *Sphere Digital, LLC v. Armstrong*, No. 20-cv-4313 (CM), 2020 WL 6064156, at *4 (S.D.N.Y. Oct. 14, 2020) (quoting *Twombly*, 550 U.S. at 555). Where a plaintiff fails to "nudge[] their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570.

Federal Rule 12(b)(6) "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of" the truth of the allegations. *Id.* at 545.

## DISCUSSION

Plaintiff asserts seven claims. Count 1 is a Title VII hostile work environment claim, Count 2 is a Title VII retaliation claim, Counts 3 and 4 are hostile work environment and retaliation claims under the NYCHRL. Counts 5, 6, and 7 and tort claims under New York law for infliction of emotional distress, tortious interference with a prospective economic advantage, and defamation.

I.   **Defendants' Motion to Dismiss is Granted in Part and Denied in Part**

The Complaint asserts all seven claims against all Defendants: Dorilton, John Doe, and Mathew.

However, the Complaint does not allege that John Doe was aware of either Mathew's conduct towards Plaintiff or of Plaintiff's report to HR and then failed to do anything about them. In fact, it does not allege that John Doe even knew who the Plaintiff was. The Complaint merely alleges that John Doe is the owner of the Dorilton Defendants. Compl. ¶ 12, 15. Owners of a business are not vicariously liable for conduct of their business's employees, whether under federal, state, or city law. See *Meyer v. Holley*, 537 U.S. 280, 286, 123 S.Ct. 824, 154 L.Ed.2d 753 (2003) ("[I]n the absence of special circumstances it is the corporation, not its owner or officer, who is the principal or employer, and thus subject to vicarious liability for torts committed by its employees or agents"); *Doe v. Bloomberg, L.P.*, 36 N.Y.3d 450, 462, 167 N.E.3d 454, 462 (2021) ("The unique provisions of the City HRL provide for broad vicarious liability for employers but that liability does not extend to individual owners, officers, employees, or agents of a business entity."). No facts are alleged that would suggest that this case involves any "special circumstances" that would contravene the usual rule. Accordingly, the motion to dismiss all counts as to John Doe is GRANTED.

Further, Plaintiff cannot assert Title VII claims against Mathew because Title VII does not provide for individual liability. *See Lore v. City of Syracuse*, 670 F.3d 127, 169 (2d Cir. 2012). Therefore, Defendant Mathew's motion to dismiss the Title VII hostile work environment and retaliation claims (Counts I and II) as to him is GRANTED. The corresponding NYCHRL claims against Mathew are not dismissed as that law provides for individual supervisory liability and

Mathew was Plaintiff's supervisor. Defendant Mathew's motion to dismiss the NYCHRL claims (Counts III and IV) is DENIED.

Interestingly, the Defendants collective known as the "Dorilton Defendants" have not moved to dismiss on the ground that they are separate enterprises and/or that only one of them was Plaintiff's employer. Whether such a motion – essentially, a motion to dismiss any "joint employer" claims that seek to link Harding's actual employer (who is not identified in the Complaint) with other related enterprises – could succeed is doubtful; it would at a minimum have spawned discovery on the joint employer issue. But no joint employer motion has been made, so there is no need to consider the issue now. For now, it is presumed to be true that all the Dorilton Defendants operate as a single enterprise and all of them employ the plaintiff. This may become an issue as we proceed into discovery.

**A.    The Motion to Dismiss Plaintiff's Hostile Work Environment Claims Against the Dorilton Defendants is Denied.**

Plaintiff alleges that Defendants subjected him to a discriminatory, hostile work environment in violation of Title VII and the NYCHRL. *See* Counts I and III.

To state a Title VII hostile work environment claim, a plaintiff must allege that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

Defendants argue that Plaintiff's hostile work environment claims (Counts I and III) fail because (1) Plaintiff has not alleged facts indicating that his employer was motivated by discriminatory intent, and (2) Plaintiff has not alleged harassment severe or pervasive enough to alter his conditions of employment.

I disagree.

Defendants argue that Plaintiff's hostile work environment claims fail because the Complaint fails to allege facts that Mathew's conduct was motivated by discriminatory intent. Mem. 5. In particular, the Defendants assert that, because none of Mathew's comments directed at Harding related to race, ethnicity or national origin, the Complaint merely sets forth allegations of "unremarkable workplace conflicts, slights, and performance disputes," rather than allegations of discriminatory animus. *Id.* 5-6.

Defendants are correct that, for a hostile work environment claim, plaintiff must allege that the conduct at issue was, at least partially, motivated by a discriminatory intent. Defendants are also correct in stating that the Complaint does not allege any comments directed at Harding that explicitly mention race. However, Plaintiff alleges that on one occasion, Mathew referred to the persons working in his household to provide care for his family member as "servants." *See* Compl. ¶ 34. He also alleges that white employees were not subjected to the same kind of harassing comments as he was – a fact from which the requisite intent may be inferred. Plaintiff "can raise an inference of a discriminatory motive in a number of ways, including by . . . pleading specific facts suggesting that other, similarly situated employees outside of the plaintiff's protected class were treated better than the plaintiff." *Rothbein v. City of New York*, No. 18-CV-5106 (VEC), 2019 WL 977878, at *9 (S.D.N.Y. Feb. 28, 2019). Harding has more than succeeded on that ground.

Plaintiff alleges that Mathew engaged in conduct that was not facially neutral because Mathew exhibited animosity towards Plaintiff that was not shown to his white teammates and deprived Plaintiff of opportunities that his white teammates received. Specifically, he alleges that Mathew chastised, berated, and humiliated Plaintiff, subjected Plaintiff's work to a significant level of scrutiny, imposed extra work requirements, and blind called Plaintiff after work hours, all

of which was not directed towards Plaintiff's white team members. Compl. ¶¶ 40, 41, 44 48. Furthermore, Plaintiff alleges that he did not receive a salary raise that white team members received, did not receive necessary information and tools that white team members received, and was subjected to unwarranted and novel disciplinary measures and consequences that white team members were not subjected to. *Id.* ¶¶ 31, 32, 41, 54.

Defendants argue that Plaintiff's comparisons to his white team members are insufficient because many of the comparisons do not disclose the alleged comparator's race, ethnicity, or national origin – instead merely referring to disparate treatment as compared to "team members." However, while not all of the comparisons in the Complaint refer explicitly to "white" team members, it is sufficient that Plaintiff does include a number of comparisons to specifically white team members who were under Mathew's supervision. *See, e.g.,* Compl. ¶¶ 40-41, 44, 62-63. Certainly there is enough in the Complaint to withstand a motion to dismiss.

Defendants further assert that Plaintiff does not establish whether any of his comparators were "similarly situated" to Plaintiff in all material respects. To establish that employees outside of the plaintiff's protected class were "'similarly situated,' the individuals with whom [plaintiff] attempts to compare herself must be similarly situated in all material respects." *Shumway v. United Parcel Serv., Inc.,* 118 F.3d 60, 64 (2d Cir.1997) (internal citations omitted). "A plaintiff is not obligated to show disparate treatment of an *identically* situated employee" but, rather, other employees "must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination." *McGuinness v. Lincoln Hall,* 263 F.3d 49, 54 (2d Cir. 2001). "In undertaking their analysis, courts generally look to whether a plaintiff and her competitors were (1) 'subject to the same performance evaluation and discipline standards' and (2) 'engaged in comparable conduct.'" *Ray v. Weit,* 2016 WL

12

1229056, at *4 (E.D.N.Y. Mar. 28, 2016) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000)).

Here, Plaintiff alleges that he received worse treatment than the white employees who were on his team, under Mathew's supervision, and responsible for similar or identical work product. Compl. ¶¶ 31-32, 40-41. Plaintiff alleges that these white team members, who were less qualified than Plaintiff, received salary raises and access to information and tools that Plaintiff did not receive. *Id.* ¶¶ 31, 54. Plaintiff further alleges specific instances in which white employees, who tasked with the same assignments as Plaintiff, were not subject to scrutiny or berated by Mathew, despite executing such tasks to a worse standard than Plaintiff. *See, e.g., id.* ¶¶ 40-41. Plaintiff also alleges that he was given work assignments to create templates intended for use by the entire team – including his white team members – that his white team members were never required to create or use. *Id.* ¶¶ 44.

These allegations are sufficient to conclude, at the motion to dismiss stage, that Plaintiff's alleged comparators are "similarly situated" to him. *See Vaigasi v. Solow Mgmt. Corp.*, No. 11-CV-5088 (RMB) (HBP), 2014 WL 1259616, at *3, *11 (S.D.N.Y. Mar. 24, 2014) (denying a motion to dismiss a hostile work environment claim where the plaintiff alleged that he "was treated 'less well' than younger, less qualified employees" and provided specific examples, such as inequitable distribution of overtime opportunities and work assignments). If, as discovery unfolds, it turns out that they are not, we can deal with that more appropriately on a motion for summary judgment. The *Twombly/Iqbal* rule has heightened pleading requirements, but it does not require a plaintiff to PROVE his case at the pleading stage by citing every detail of his evidence in a complaint.

The cases cited by Defendants in support of their argument are distinguishable. In *Stinnett v. Delta Air Lines, Inc.*, the court dismissed a Title VII discrimination claim as the Complaint did not allege facts showing that the Plaintiff was similarly situated to her male employees. 278 F.Supp.3d 599, 611-612 (E.D.N.Y. 2017). In that case, Plaintiff alleged sex discrimination against her employer when she was not reinstated after completing alcohol and drug rehabilitation, while her male counterparts were. *Id.* However, in her complaint, Plaintiff did not make any allegations that she was engaged in comparable conduct and subject to the same performance evaluation and discipline standards as her peers. Instead, Plaintiff alleged that the men were *different* in a material respect, as they had a drug and alcohol disability, while Plaintiff did not. *Id.* In *Anderson v. Davis Polk & Wardwell LLP*, Plaintiff claimed that he was treated differently than a female colleague, both of whom were clerical staff in the Managing Attorney's Office of a law firm. 850 F. Supp. 2d 392, 407 (S.D.N.Y. 2012). However, in alleging his claims, Plaintiff did not state "in even conclusory fashion" that he and his female counterpart were similarly situated employees and he did not plead any facts regarding the nature of the tasks his female counterpart received in comparison to his own. *Id.* As such, the court did not assume that all clerical staff were interchangeable.

Here, Plaintiff has described enough specific examples of disparate treatment from employees that were similarly situated to him in all material respects to satisfy the requirement that he allege sufficient facts to raise an inference of discriminatory motive.

Next, Defendants argue that Plaintiff's Title VII claim must be dismissed because Harding's allegations of Mathew's mistreatment are not sufficiently severe to show as an *objective* matter that a reasonable employee would find the conditions of her employment altered for the worse based on discriminatory harassment. Mem. 11. They are wrong.

In determining whether conduct is "severe or pervasive," courts "must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Littlejohn*, 795 F.3d at 321 (quoting *Harris*, 510 U.S. at 23). This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir.2014). And in this Circuit, Plaintiff "need not show that [his] hostile working environment was both severe *and* pervasive; only that it was sufficiently severe *or* sufficiently pervasive, or a sufficient combination of these elements, to have altered [his] working conditions." *Pucino v. Verizon Commc'n, Inc.*, 618 F.3d 112, 119 (2d Cir. 2010) (emphases in original).

Determining whether conduct is severe or pervasive enough to create a hostile work environment involves a question of fact and is generally inappropriate to determine at the pleadings stage of a litigation. *Patane v. Clark*, 508 F.3d 106, 114 (2d Cir. 2007). The Second Circuit has "cautioned against setting the bar too high," emphasizing that "a plaintiff need only plead facts that support the conclusion that she was faced with 'harassment . . . of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse.'" *Id.* (quoting *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir.2003)).

Plaintiff has pointed to multiple instances in which he was subjected to comments and conduct that could support a claim that Plaintiff's work environment was "altered" and "abusive." Plaintiff alleges that he was subject to continuous harassment from Mathew over the course of his employment with Defendants, which included: derogatory comments and poor treatment, such as

use of an abrasive, impatient and condescending tone (Compl. ¶ 36), consistently misnaming Plaintiff (*id.* ¶¶ 36, 69), responding to questions with insults (*id.* ¶ 45), and embarrassing Plaintiff on calls with clients (*id.* ¶¶ 37-38).

Plaintiff further alleges conduct that made it difficult for him to do his job effectively. Specifically, Mathew "interfered with [Plaintiff's] working conditions" through demonstrating a pattern of unwarranted scrutiny towards Plaintiff's work (Compl. ¶¶ 40-41, 50), shadowing Plaintiff by joining client calls and encouraging Plaintiff's teammates to do the same (*id.* ¶ 42), blind calling Plaintiff on his personal cell phone outside of work hours (*id.* ¶ 48), forcing Plaintiff to complete extra projects not required of other team members (*id.* ¶ 44, 62, 64), and replacing new projects with failing older projects (*id.* ¶ 72). Significantly, Plaintiff also alleges that he did not receive promotions (*id.* ¶¶ 30, 54), salary raises (*id.* ¶ 31), or critical training and tools required to complete his job (*id.* ¶ 54).

Taken together, these incidents consist of ongoing hostility that impacted Plaintiff's day-to-day work environment. Indeed, Plaintiff alleges that, as a result of Mathew's actions in front of clients, portfolio company clients commented to Plaintiff privately and without prompting about Mathew's animus and hostile behavior. Compl. ¶ 39. Plaintiff further alleges that the extent of the hostility led him to, first, inform Mathew that HR might need to become involved in order to review all the extra work Plaintiff was receiving and unprofessional tone and language directed at Plaintiff and, second, to ultimately raise his concerns regarding his treatment by Mathew to HR. *Id.* ¶¶ 49, 57, 73.

Overall, the pattern of behavior is pervasive enough that reasonable people would consider their working conditions to be altered as a result. *See Pucino*, 618 F.3d at 115 (hostile work environment found based on, *inter alia*, supervisor denied plaintiff tools which "made it difficult,

if not impossible, for her to perform her work properly"); *Spence v. Bukofzer*, No. 15 CIV. 6167 (ER), 2017 WL 1194478, at *8 (S.D.N.Y. Mar. 30, 2017) (allegations that plaintiff was excluded from work meetings, received unfavorable assignments, was demoted, and complained internally about a racially hostile environment "plausibly describes an objectively hostile work environment that could have reasonably interfered with her ability to work").

The cases cited by Defendants to support their assertion that the conduct alleged is not sufficiently severe or pervasive are distinguishable. Most do not allege the same level of harassment asserted here and do not include allegations beyond derogatory comments and general hostility from supervisors. *E.g., Littlejohn*, 795 F.3d at 321 (general hostility directed at plaintiff but no allegations of impact to salary, promotions, or training); *Philbert v. City of New York*, 2022 WL 94574, at *19 (S.D.N.Y. Jan. 7, 2022) (plaintiff alleged only specific, episodic moments of unpleasantness rather than a pervasive hostile work environment). Others did not arise on motions to dismiss, but were summary judgment motions, when the allegations of the complaint are no longer presumed true but must be supported by admissible evidence. *E.g., Nugent v. St. Luke's-Roosevelt Hosp. Ctr.*, 303 F. App'x 943, 945 (2d Cir. 2008) (appeal from summary judgment decision).

I thus have no difficulty concluding that the Complaint states a claim for hostile work environment created by Harding's supervisor, Matthew, acting within the scope of his employment. As Mathew was Harding's supervisor, and Harding pleads that he reported Mathew's abuse to the employer's HR department, which did nothing about it, he has pleaded sufficient facts to make out a hostile work environment claim against Harding's employer, under both federal and city law. *Snell v. Suffolk County*, 782 F.2d 1094, 1104 (2d Cir.1986); *Murray v. New York Univ. Coll. of Dentistry*, 57 F.3d 243, 249 (2d Cir. 1995).

For these reasons, the motion by the Dorilton Defendants to dismiss Counts I and III as to them is DENIED.

### B.    The Motion to Dismiss Plaintiff's Retaliation Claims Against the Dorilton Defendants is Denied.

Counts II and IV are retaliation claims. Plaintiff alleges that, in violation of federal and city law, Defendants retaliated against him for complaining to HR about Mathew's discriminatory conduct.

To prevail on his retaliation claims, Plaintiff need not prove that his "underlying complaint of discrimination had any merit," only that his underlying complaint was motivated by a "good faith, reasonable belief" that the conduct complained of was unlawful. *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (quoting *Lore*, 670 F.3d at 157); *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir.1996)).

Retaliation claims are analyzed under the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green* (the "*McDonnell Douglas* framework"). 411 U.S. 792 (1973). Under *McDonnell Douglas*, the burden initially falls on a plaintiff to plead a *prima facie* retaliation case. To state a *prima facie* case, Plaintiff must allege (1) that he participated in a protected activity, (2) that his participation was known to his employer, (3) that his employer thereafter subjected him to a materially adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse employment action. *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010). The plaintiff's burden of proof at the *prima facie* stage is *de minimis*. *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010). If and when the initial burden is met by the plaintiff, a "presumption of retaliation" arises, which the defendant may rebut by "articulating a legitimate, non-retaliatory reason for the adverse employment action." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). If the defendant provides such a

reason, "the presumption of retaliation dissipates," and the burden shifts back to the plaintiff to prove "that the desire to retaliate was the but-for cause of the challenged employment action." *Id.* (citation omitted).

To state a claim for retaliation, Plaintiff must first allege that she engaged in a protected activity. In this context, engagement in a protected activity refers to any action taken to protest or oppose statutorily prohibited discrimination. *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 682 (S.D.N.Y. 2012); Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e–3(a). Opposition to a Title VII violation need not rise to the level of a *formal* complaint in order to receive statutory protection. *Davis-Bell*, 851 F. Supp. 2d at 682. "The law protects employees in the filing of formal charges of discrimination as well as in the making of informal protests of discrimination, including complaints to management." *La Grande v. DeCrescente Dist. Co., Inc.*, 370 Fed. Appx. 206, 212 (2d Cir.2010).

Plaintiff alleges that on June 17, 2021, he brought up concerns regarding his treatment by Mathew and the wording of his performance review with HR. Compl. ¶¶ 57, 73. Plaintiff further alleges that he provided HR with clear dates and names of incidents of discrimination. *Id.* ¶ 57. Then on August 3, 2021, Plaintiff was terminated without notice. *Id.* ¶ 73. Therefore, Plaintiff alleges that he "opposed a practice that he reasonably believed was unlawful under Title VII and was fired for doing so." Compl. ¶ 84 (Count II).

Defendants contend that, even assuming Plaintiff subjectively believed that his complaint to HR related to unlawful discrimination, his belief was not objectively reasonable. Mem. 14. That argument is, frankly, ridiculous. Reading the pleading most favorably to the pleader, the Complaint pleads detailed facts from which a trier of fact could conclude (1) that Mathew was discriminating against the Plaintiff and, (2) that Harding brought this situation to the attention of the company,

after which (3) he was fired. That is enough to plead a claim of retaliation, whether under federal or city law. *Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C.*, cited by movants, is easily distinguished, because in that case no facts were pleaded that gave rise to any such inference. 716 F.3d 10, 15 (2d Cir. 2013).

Next, Defendants challenge causation; they argue that Plaintiff has not alleged a causal link between the alleged protected activity of reporting Mathew's discriminatory conduct to HR and the alleged adverse employment action of termination. A causal link is alleged either by pleading facts to support the inference that the defendant was motivated by retaliatory animus, or by pleading a close temporal proximity between the protected activity and the retaliatory action. *Summer v. U.S. Postal Service*, 899 F.2d 203, 209 (2d Cir.2009).

Specifically, Defendants assert that Plaintiff's termination cannot be linked to his HR complaint because he alleges no facts suggesting that the decision to fire Plaintiff was motivated by retaliatory animus. Further, Defendants state that there is not a sufficiently close temporal proximity between the HR report and his termination to allege a causal link. Defendants cite to district court cases within the Second Circuit stating that the passage of two to three months between the protected activity and adverse employment action cannot lead to an inference of causation.

The Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Gorman–Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554 (2d Cir.2001) (holding that temporal proximity of four months "is sufficient to support an allegation of a causal connection strong enough to survive a summary judgment motion"); *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010)

("Though this Court has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, we have previously held that five months is not too long to find the causal relationship.")

In this case, the length of time between the protected activity and alleged adverse employment action was six weeks and three business days. This is close enough in temporal proximity to support an inference of causation.

The Dorilton Defendants' motion to dismiss Count II and Count IV as to them is DENIED.

## C.     The New York Tort Law Claims

Plaintiff brings three tort claims under New York law against the Defendants: (i) intentional infliction of emotional distress ("IIED"); (ii) tortious interference with a prospective economic advantage; (iii) defamation. *See* Counts V, VI and VII.

### 1.     The Motion to Dismiss Plaintiff's Infliction of Emotional Distress Claim is Granted

To satisfy the standard for intentional infliction of emotional distress, a plaintiff must describe conduct "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Murphy v. American Home Prod. Corp.*, 461 N.Y.S.2d 232, 236 (N.Y. 1983) (quoting Rest. Second Torts § 46(1), comment d). IIED is a highly disfavored claim at law, so this standard is "rigorous, and difficult to satisfy." *Howell v. New York Post Co.*, 81 N.Y.2d 115, 122 (1993) (citation omitted). "New York courts are exceedingly wary of claims for intentional infliction of emotional distress in the employment context because of their reluctance to allow plaintiffs to avoid the consequences of the employment-at-will doctrine by bringing a wrongful discharge claim under a different name." *Mariani v. Consol. Edison Co.*, 982 F. Supp. 267, 275 (S.D.N.Y. 1997) (collecting cases), *aff'd*, 172 F.3d 38 (2d Cir. 1998).

Plaintiff's allegations against the Defendants do not overcome this extremely high burden. If they did, then every case that sufficiently alleged employment discrimination would also perforce allege a claim for IIED. While the behavior described in the Complaint is, if it be true, despicable, it is (sadly) a type of behavior that is commonly seen in far too many workplaces. Bad behavior is not necessarily extreme behavior. The incidents alleged – Mathew's addressing Plaintiff in a "specific, abrasive, impatient and condescending tone", "deliberately and maliciously" misnaming Plaintiff, telling "caustic jokes", and painting a picture of Plaintiff as "lazy" and "slow" (Compl. ¶¶ 36, 45) – while ugly, are not so "atrocious" as to be "utterly intolerable in a civilized society." *See Spence v. Maryland Casualty Co.*, 995 F.2d 1147, 1158 (2d Cir. 1993) ("[The] [d]efendants' criticisms of [the plaintiff's] job performance and their conditional threats of termination . . . fall far short of the 'extreme' and 'outrageous' conduct that is actionable as an intentional infliction of emotional distress."); *Semper v. New York Methodist Hosp.*, 786 F.Supp.2d 566, 587 (E.D.N.Y.2011) ("Acts which merely constitute harassment, disrespectful or disparate treatment, a hostile environment, humiliating criticism, intimidation, insults or other indignities fail to sustain a claim of [infliction of emotional distress] because the conduct alleged is not sufficiently outrageous.").

Accordingly, the motion to dismiss Count V is GRANTED.

### 2. The Motion to Dismiss Plaintiff's Tortious Interference with a Prospective Economic Advantage Claim is Granted

To state a claim for tortious interference with prospective economic advantage under New York law, a plaintiff must allege that (1) that he had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's

interference caused injury to the relationship. *Friedman v. Coldwater Creek, Inc.*, 321 F. App'x 58, 60 (2d Cir. 2009).

Plaintiff alleges that "due to his background and longtime presence in the IT industry, Plaintiff had a reasonable expectation of entering into a valid business relationship with prospective customers, clients, or new employers" and that "defendants' purposeful interference prevented Plaintiff's legitimate expectancy from ripening into valid business relationships." Compl. ¶¶ 105, 107.

The first element of a tortious interference claims requires a showing that the Plaintiff had a "reasonable probability of entering into a business relationship with a third party." *BDCM Fund Adviser, L.L.C. v. Zenni*, 103 A.D.3d 475, 962 N.Y.S.2d 11, 15 (2013)). Mere "vague and conclusory allegations" of such a probability are not sufficient. *Id.* The Complaint does not set forth any particulars regarding any business relationships into which Plaintiff expected to enter. Plaintiff does not identify any employers who refused to hire him on the ground that he had been fired by Dorilton; it does not identify any opportunities that Plaintiff had that were taken away from him after, for example, a reference check at Dorilton. Instead, it alleges only that Plaintiff's background and longtime presence in the IT industry resulted in a "reasonable expectation" of relationships. That is legally insufficient.

Further, with respect to Defendants' alleged interference, "as a general rule, a defendant's conduct must amount to a crime or an independent tort in order to amount to tortious interference with a prospective economic advantage." *Friedman*, Fed. App'x. at 60 (citing *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190, 785 N.Y.S.2d 359, 818 N.E.2d 1100 (2004)). "A defendant who has not committed a crime or independent tort or acted solely out of malice may nevertheless be liable if he has employed wrongful means," such as "physical violence, fraud or misrepresentation, civil

suits and criminal prosecutions and extreme and unfair economic pressure." *Id.* (citations omitted). Here, the only interference that Plaintiff alleges is that Mathew "questioned Plaintiff's professional capabilities" and demonstrated "animus and hostile behavior" towards Plaintiff in front of portfolio company clients. No fact is alleged tending to show that Plaintiff might have been hired at any of these portfolio companies, so this alone is not a sufficient level of malice or wrongful means to state the claim. *See id.* (holding that the defendant's falsely informing a prospective employer about the plaintiff's rude and inappropriate behavior does not rise to the level of "more culpable" conduct usually required for tortious interference). Indeed, Plaintiff's failure to allege that Matthew or Dorilton interacted with any potential employer sounds the death knell to his tortious interference claim.

Defendants' motion to dismiss Count VI is GRANTED.

### 3. The Motion to Dismiss Plaintiff's Defamation Claim is Denied

The law of defamation serves to protect an individual's right to one's reputation. *See Gertz v. Welch*, 418 U.S. 323, 343–45, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). However, courts have held that, "Because a defamation suit may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself, courts should, where possible, resolve defamation actions at the pleading stage." *Adelson v. Harris*, 973 F. Supp.2d 467, 481 (S.D.N.Y. 2013), (internal quotations and citations omitted), *aff'd*, 876 F.3d 413 (2d Cir. 2017).

Defamation is the injury to one's reputation either by written expression, which is libel, or by oral expression, which is slander. *See Morrison v. Nat'l Broad. Co.*, 19 N.Y.2d 453, 280 N.Y.S.2d 641, 227 N.E.2d 572, 574 (1967). However, the elements of each are substantively similar. *Compare Albert v. Loksen*, 239 F.3d 256, 265-66 (2d Cir. 2001) (slander), *with Celle v. Filipino Reporter Enters., Inc.*, 209 F.3d 163, 176 (2d Cir. 2000) (libel). To establish defamation under New York law, a plaintiff must prove: (i) a defamatory statement of fact, (ii) that is false,

(iii) published to a third party, (iv) "of and concerning" the plaintiff, (v) made with the applicable level of fault on the part of the speaker, (vi) either causing special harm or constituting slander per se, and (vii) not protected by privilege. *See, Dillon v. City of New York*, 261 A.D.2d 34, 37–38, 704 N.Y.S.2d 1, 5 (1st Dep't 1999). "Whether particular words are defamatory presents a legal question to be resolved by the court in the first instance." *Celle*, 209 F.3d at 176.

Plaintiff alleges that Mathew defamed him when he called Plaintiff "a liar, dumb, lazy, constantly late, full of excuses, someone who places the blame for problems upon others and someone who ultimately is unqualified for his duties." Compl. ¶ 109. Plaintiff further states that Mathew "asserted to all team members and clients . . . that Plaintiff was not fit to work within this limited community and area of expertise." *Id.*

Defendants contend that Plaintiff's defamation claim collapses at the outset because Plaintiff fails to plead adequately the actual words spoken. However, Plaintiff is not required to plead with particularity to survive dismissal under Rule 12(b)(6); moreover, Plaintiff sets forth in his Complaint the specific statements ("liar," "dumb," "lazy") that he alleges are defamatory. This is sufficient at the pleading stage.

Additionally, Defendants argue that the criticisms that Plaintiff alleges are defamatory would fall under the qualified privilege that extends to false defamatory statements made to people with a "common interest in the subject matter." *Foster v. Churchill*, 87 N.Y.2d 744, 751, 665 N.E.2d 153 (1996). This privilege applies to "evaluations or statements of employees made by their superiors." *Shamley v. ITT Corp.*, 869 F.2d 167, 173 (2d Cir.1989); *see also Albert*, 239 F.3d at 272 ("Communications by supervisors or co-workers made in connection with the evaluation of an employee's performance, including allegations of employee misconduct and communications regarding the reasons for an employee's discharge, fall within the [common interest] privilege.").

However, a defendant may forfeit this qualified privilege by "making a false, defamatory statement with 'malice' of either the common-law or constitutional variety." *Albert*, 239 F .3d at 272. "Constitutional or "actual" malice means publication with knowledge that [the statement] was false or . . . reckless disregard of whether it was false or not. "Reckless disregard" as to falsity means that the statement is made with [a] high degree of awareness of [the publication's] probable falsity or while the defendant in fact entertained serious doubts as to the truth of [the] publication." *Id.*

The Complaint asserts that Plaintiff took very little time for vacation and personal days in comparison to his peers, volunteered to work during holidays, had a more extensive scope of responsibilities and work, and outperformed every team member in every category of the performance issues brought up against him in his performance review. Compl. ¶¶ 29-30, 45, 50, 57. As Plaintiff's direct supervisor, Mathew would have been aware of these facts. Nonetheless, the Complaint alleges that Mathew disparaged Plaintiff and depicted him as lazy, slow, a liar, and dumb in front of both fellow team members and clients. *Id.* ¶¶ 37, 38, 45 109. Thus, Plaintiff has sufficiently alleged that Mathew acted with malice in making his defamatory remarks.

The motion to dismiss Count VII against Dorilton and Mathew is DENIED.

## II.    Plaintiff's Motion for Leave to Amend is Denied

The remaining motion before this court is Plaintiff's Motion to Amend the Complaint. Dkt. No. 30. Rule 15(a) provides that leave to amend a complaint "shall be freely given when justice so requires." *See* Fed. R. Civ. P. 15(a)(2). The Supreme Court has, however, interpreted Rule 15 to permit such amendments only when (1) the party seeking the amendment has not unduly delayed, (2) when that party is not acting in bad faith or with a dilatory motive, (3) when the opposing party will not be unduly prejudiced by the amendment, and (4) when the

amendment is not futile. *See Foman v. Davis,* 371 U.S. 178, 182 (1962). The moving party "must explain any delay," but the party opposing the amendment bears the burden of showing bad faith, prejudice, or futility. *See United States ex rel. Raffington v. Bon Secours Health Sys., Inc.,* 285 F.Supp.3d 759, 766 (S.D.N.Y. 2018) (citing cases). "Mere delay . . . absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend." *State Teachers Ret. Bd. v. Fluor Corp.,* 654 F.2d 843, 856 (2d Cir. 1981).

In his combined brief in opposition to Defendants' motion to dismiss and in support of his motion to amend the Complaint, Plaintiff states that he seeks leave to add causes of action for disparate treatment under Title VII and the New York State Human Rights Law ("NYSHRL"). *See* Dkt. No. 31 at 17. However, in the proposed amended complaint that Plaintiff submitted together with his brief, Plaintiff did not add these additional causes of action; rather, he simply made two minor additions referencing disparate treatment within the existing Title VII and NYCHRL hostile treatment claims. *See* Dkt. No. 32-2 ¶¶ 79, 88.[4]

"Where it appears that granting leave to amend is unlikely to be productive, however, it is not an abuse of discretion to deny leave to amend." *Lucente v. Int'l Bus. Machines Corp.,* 310 F.3d 243, 258 (2d Cir. 2002) (internal quotation removed). Indeed, in these cases, denying leave to amend is "appropriate." *Griffith-Fenton v. Coldwell Banker Mortg.,* No. 13 CV 7449 VB, 2014 WL 6642715, at *1 (S.D.N.Y. Oct. 17, 2014).

The proposed amended complaint does not seek to add any additional counts or claims, it merely incorporates the phrase "disparate treatment" into Counts I and III, the hostile work environment claims. But the court has ruled those claims sufficiently pled; there is no need to add

---

[4]       While the language added to Count III, the hostile work environment claim under the NYCHRL, references disparate treatment in violation of the NYSHRL, the Court assumes that Plaintiff in fact meant to reference the NYCHRL in its addition.

any references to "disparate treatment," because Plaintiff pleaded facts from which it can be inferred that he was treated differently from white comparators. *See supra*, section I.B.i. Therefore, the proposed amendments add nothing but surplusage to an already adequate complaint.

## CONCLUSION

For the reasons discussed above, the motion to dismiss Counts V and VI of the Complaint is GRANTED, without prejudice. The motion to dismiss all counts against John Doe is GRANTED. The motion to dismiss Counts I and II against Mathew is GRANTED. The motion to dismiss is otherwise DENIED. Plaintiff's cross-motion to amend the Complaint is DENIED.

This constitutes the decision and order of the court. It is a written opinion. The Clerk of Court is respectfully directed to terminate the motions at Docket Number 24 and 30.

Dated: October 18, 2022
      New York, New York

                                        U.S.D.J.

BY ECF TO ALL COUNSEL

28